UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HEIDI RUBIN,

       Plaintiff,

v.                                Case No. 6:22-cv-661-MAP

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

_____/

## **ORDER**

    Plaintiff seeks judicial review of the denial of her claim for Supplemental Security Income (SSI).[1]  Plaintiff argues that the Administrative Law Judge (ALJ) committed reversible error by failing to properly consider the medical opinions and Plaintiff's testimony regarding her severe mental impairments.  As the ALJ's decision was not based on substantial evidence and failed to employ proper legal standards, the Commissioner's decision is reversed and remanded.

    *I.*    *Background*

    Plaintiff, who was born in 1971, claimed disability beginning March 25, 2018 (Tr. 269).  She was 46 years old on the alleged onset date.  Plaintiff attended two years of college and has no past relevant work experience (Tr. 26, 297).  Plaintiff alleged

---

[1]  The parties have consented to my jurisdiction.  *See* 28 U.S.C. § 636(c).

disability due to post-traumatic stress disorder (PTSD), generalized anxiety, and major depressive disorder (Tr. 296).

Given her alleged disability, Plaintiff filed an application for SSI (Tr. 269-75). The Social Security Administration (SSA) denied Plaintiff's claims both initially and upon reconsideration (Tr. 64-124). Plaintiff then requested an administrative hearing (*see* Tr. 139-53). Per Plaintiff's request, the ALJ held a telephonic hearing at which Plaintiff appeared and testified (Tr. 34-56). Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 13-33).

In rendering the administrative decision, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since February 5, 2020, the application date (Tr. 18). After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: degenerative joint disease of the knees, mild obesity, major depressive disorder, generalized anxiety disorder, and PTSD (Tr. 18). Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 18). The ALJ then concluded that Plaintiff retained a residual functional capacity (RFC) to perform light work with the following limitations: occasional postural activities, including climbing, balancing, stooping, kneeling, crouching, and crawling; needed to avoid concentrated exposure to vibrations, work around moving mechanical parts, or work at unprotected heights;

limited to performing work which needs little or no judgment to do simple duties that could be learned on the job in a short time (up to and including 30 days); was able to deal with changes in a routine work setting; and was able to relate adequately to supervisors with occasional contact with coworkers and the general public (Tr. 20). In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 21).

Given Plaintiff's background and RFC, the vocational expert (VE) testified that Plaintiff could perform jobs existing in significant numbers in the national economy, such as a merchandise marker, a mail sorter, and a routing clerk (Tr. 26, 52). Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 27). Given the ALJ's finding, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-7, 258-68). Plaintiff then timely filed a complaint with this Court (Doc. 1). The case is now ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3).

II.    *Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" is an "impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

To regularize the adjudicative process, the SSA promulgated the detailed regulations currently in effect.  These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled.  20 C.F.R. § 416.920.  If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary.  20 C.F.R. § 416.920(a).  Under this process, the ALJ must determine, in sequence, the following:  whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work.  20 C.F.R. § 416.920(a)(4)(i)-(iv).  If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience.  20 C.F.R. § 416.920(a)(4)(v).  A claimant is entitled to benefits only if unable to perform other work.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 416.920(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014); *Winschel*, 631 F.3d at 1178 (citations omitted); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

III.    Discussion

Plaintiff argues that the ALJ erred by failing to properly consider the medical opinions pertaining to Plaintiff's mental impairments from Plaintiff's psychiatrist, Indhira Almonte, M.D.; examining psychologist, Laura Cohen, Ph.D.; and the state agency psychological consultants.[2]   Under the regulations, an ALJ will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative finding, including from a claimant's medical source. 20 C.F.R. § 416.920c(a).   Rather, in assessing a medical opinion, an ALJ considers a variety of factors, including but not limited to whether an opinion is well-supported, whether an opinion is consistent with the record, the treatment relationship between the medical source and the claimant, and the area of the medical source's specialization.   20 C.F.R. § 416.920c(1)-(4).   The primary factors an ALJ will consider when evaluating the persuasiveness of a medical opinion are supportability and consistency.   20 C.F.R. § 416.920c(a) & (b)(2).   Specifically, the more a medical source presents objective medical evidence and supporting explanations to support the opinion, the more persuasive the medical opinion will be.   20 C.F.R. § 416.920c(c)(1). Further, the more consistent the medical opinion is with the evidence from other medical sources and nonmedical sources, the more persuasive the medical opinion will be.   20 C.F.R. § 416.920c(c)(2).   And, in assessing the supportability and consistency

---

[2]   Plaintiff also contends that the ALJ failed to properly consider her testimony and her subjective complaints regarding her mental impairments.   As the two issues are intimately intertwined, and since her subjective complaints serve as the primary basis for the medical opinions, the ALJ should reconsider Plaintiff's subjective complaints upon remand.

of a medical opinion, the regulations provide that the ALJ need only explain the consideration of these factors on a source-by-source basis – the regulations do not require the ALJ to explain the consideration of each opinion from the same source. *See* 20 C.F.R. § 416.920c(b)(1).  Beyond supportability and consistency, an ALJ may also consider the medical source's specialization and the relationship the medical source maintains with the claimant, including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and whether the medical source examined the claimant, in addition to other factors.  20 C.F.R. § 416.920c(c)(3)(i)-(v), (4) & (5).  While the ALJ must explain how he or she considered the supportability and consistency factors, the ALJ need not explain how he or she considered the other factors.[3]  20 C.F.R. § 416.920c(b)(2).

### A.    Dr. Almonte

As the ALJ discussed, Plaintiff underwent psychiatric treatment with Dr. Almonte from January 2020 through April 2021 (Tr. 21-25, 504-18, 524-44, 552-55, 573-75).[4]  During her initial appointment, despite showing some normal or fair findings upon examination, including intact associations, logical thinking, appropriate thought content, alertness, fair insight, and fair judgment, Plaintiff appeared "sad

---

[3] The exception is when the record contains differing but equally persuasive medical opinions or prior administrative medical findings about the same issue.  *See* 20 C.F.R. § 416.920c(b)(3).

[4] As the ALJ acknowledged, prior to the relevant period, Plaintiff was assessed with anxiety and depression and sought treatment for those issues plus panic attacks, PTSD, and fatigue (Tr. 21, 379-503).

looking" and distracted, her demeanor was sad, she was tearful, her affect was constricted, she could not correctly perform simple arithmetic calculations, she showed mild but diffuse memory loss with difficulty remembering recent events and periods of confusion about details, she was unable to recall 3/3 objects at five minutes, and she showed signs of anxiety (Tr. 507-08). Dr. Almonte diagnosed Plaintiff with major depressive disorder, recurrent severe without psychotic features; generalized anxiety disorder; and PTSD, unspecified, and noted that all three presented as active issues (Tr. 508). Dr. Almonte recommended a physical examination and labs, prescribed Plaintiff Zoloft and Prazosin, and recommended psychotherapy, including a follow-up appointment in three to four weeks or sooner if Plaintiff needed (Tr. 508).

The following month, Plaintiff returned to Dr. Almonte indicating that she "tried to do better but has not been able to" despite taking her medications daily as prescribed (Tr. 510). Plaintiff reported continued symptoms of depressed mood, anhedonia, poor appetite, poor sleep, decreased concentration, difficulty thinking, difficulty making decisions, isolation, feeling guilty, excessive worrying, crying spells, anergia, feeling tired all the time, feeling unmotivated, and wanting to be in bed all the time (Tr. 510). She further reported feeling overwhelmed, as she was not able to sleep due to nightmares about her father's death, when she tried to resuscitate him with CPR to no avail, as well as her mother's death four years later, and she experienced constant flashbacks and hypervigilance (Tr. 505, 510). Like the prior month, despite some normal findings on examination, Plaintiff presented as sad looking, distracted, disheveled, anxious, sad demeanor, downcast appearance, and tearful, while her facial

expression and general demeanor revealed a depressed mood, simple arithmetic calculations were not correctly performed, and she showed mild but diffuse memory loss with difficulty remembering recent events and periods of confusion about details (Tr. 510-11).  Dr. Almonte increased Plaintiff's Zoloft and Prazosin dosages and added Vistaril to her medication regimen (Tr. 511).  She advised Plaintiff to follow up in four weeks or sooner and to call 911 or go to the nearest emergency department in case of worsening symptoms or suicidal ideation (Tr. 511).

In March 2020, Plaintiff reported issues with medication affecting her sleep and was advised on how to proceed with Prazosin and Vistaril at bedtime (Tr. 513).  On the same day, Dr. Almonte filled out a Psychiatric/Psychological Impairment Questionnaire, wherein she discussed Plaintiff's major depressive disorder, generalized anxiety disorder, and PTSD and the limitations stemming from each (Tr. 519-23).  Dr. Almonte identified a long list of signs and symptoms supporting those diagnoses and indicated that Plaintiff's course of treatment had been consistent with such symptoms, the diagnoses and limitations were expected to last at least 12 months, and Plaintiff was not a malingerer (Tr. 519-20).  As to the most frequent signs and symptoms, Dr. Almonte pointed to Plaintiff's depressed mood, anhedonia, poor sleep, decreased concentration, forgetfulness, nightmares, flashbacks, hypervigilance, and anxiety (Tr. 521).  According to Dr. Almonte, Plaintiff's psychiatric conditions exacerbated her chronic pain, would cause episodes of decompensation or deterioration in a work or work-like setting that would make her unable to work, and would not result in good days or bad days but rather would affect her every day (Tr.

521).  Given her impairments and attendant symptoms, Dr. Almonte concluded that Plaintiff would experience moderate-to-marked or marked limitations in all areas of mental functioning, including understanding and memory, concentration and persistence, social interactions, and adaptation (Tr. 522).  Finally, Dr. Almonte opined that Plaintiff would be absent more than three times per month due to her impairments and treatment, Plaintiff's symptoms and limitations spanned back to 2014 when her father passed away, and Plaintiff's symptoms and limitations were reasonably consistent with the clinical and objective findings (Tr. 523).

Due to the start of the coronavirus pandemic, Plaintiff had to reschedule her follow-up appointment to May 2020 (Tr. 527-29).  Again, despite taking her medications daily, Plaintiff continued to report depressive and anxiety symptoms and stated that they were getting worse because her sister who supported her financially lost her job and because of the pandemic (Tr. 528).  Plaintiff continued to report depressive symptoms, sadness, anhedonia, difficulty concentrating, poor appetite, excessive worrying, difficulty making decisions, excessive fatigue, guilty feelings, difficulty sleeping, decreased sociability, difficulty thinking, feelings of worthlessness, feelings of restlessness, irritability, increased muscular tension, excessive worrying, and continued flashbacks, nightmares, and dreams about her parents' death (Tr. 528). Dr. Almonte noted the same findings upon examination as the prior appointments and indicated that Plaintiff continued to present with severe symptoms of depression, nightmares, flashbacks, and anxiety, which continued to affect Plaintiff's functional capacity, so Dr. Almonte would continue optimizing medications (Tr. 528-29).  To

that end, Dr. Almonte increased Plaintiff's Zoloft prescription and continued Plaintiff on Prazosin and Vistaril (Tr. 529).

In June 2020, Plaintiff reported the same symptoms, and Dr. Almonte made the same findings upon examination as at prior appointments (Tr. 534-35).  Given the continuing issues, Dr. Almonte increased Plaintiff's Zoloft prescription and continued Plaintiff on Prazosin and Vistaril (Tr. 535).  Thereafter, in October 2020, Plaintiff reported that she had not been doing well because she contracted the coronavirus but also continued to report symptoms of depression, anxiety, flashbacks, nightmares, fatigue, decreased energy, feeling unmotivated, worsened anxiety, fear of talking to people, and an inability to leave her house due to anxiety attacks leading to an inability to function (Tr. 552).  Dr. Almonte again noted the same findings upon examination, including Plaintiff appearing sad looking, distracted, disheveled, anxious, restless, and being visibly distressed (Tr. 552-53).  Although Plaintiff stopped taking the Vistaril, Dr. Almonte directed that Plaintiff take that along with the Zoloft and Prazosin to help with her anxiety symptoms (Tr. 553).

Plaintiff, despite taking her medications daily, continued to report symptoms of depression and anxiety in January 2021 (Tr. 554).  She still grieved over her parents' death, and her worsening financial problems, complicated by the cancellation of her food stamps, added to her anxiety (Tr. 554).  Plaintiff indicated that she experienced sadness, anhedonia, hopelessness, decreased concentration, poor memory, and poor sleep (Tr. 554).  Upon examination, Dr. Almonte mirrored her prior findings, except that Plaintiff's memory was now grossly intact (Tr. 554).  Given Plaintiff's continued

symptoms of depression and anxiety, which affected Plaintiff's functional capacity, Dr. Almonte suggested adding Abilify to Plaintiff's medication regimen (Tr. 555). Plaintiff told Dr. Almonte that she did not have money to buy more medications so preferred to continue with the current medications, which Dr. Almonte did (Tr. 555).

At her April 2021 appointment, Plaintiff again reported symptoms of depression, anxiety, decreased concentration, forgetting things, and increasing irritability (Tr. 574). Dr. Almonte noted similar findings on examination to those set forth at the January 2021 appointment (Tr. 574). Dr. Almonte advised Plaintiff to start Abilify to help with the symptoms of depression and irritability, but Plaintiff stated that she was afraid of taking more medications, so Dr. Almonte continued Plaintiff on her current medication regimen (Tr. 575).

B.    *Dr. Cohen*

In March 2021, at the request of Plaintiff's representative, Dr. Cohen performed a consultative psychological evaluation of Plaintiff, including a review of her medical records (Tr. 23, 561-66). During the examination, Plaintiff described the same symptoms as those she described to Dr. Almonte but also indicated that she required a hospitalization around 2018 due to a reaction to an increased psychotropic medication, which made her concerned to add Abilify to her medication regimen (Tr. 563-65, 568). She presented as tearful, indicated she gained weight since turning to food as a comfort for her depression, said her sleep was broken, she still had nightmares (although the Prazosin reduced the nightmares), she had high blood pressure from the anxiety, she spoke rapidly, she was unfocused, her thought processes

were both circumstantial and tangential and required a lot of redirection, she made some eye contact, her affect was distressed, she did not smile, she was stressed, she had difficulty expressing herself, she put herself down, her grooming was fair, and she was very anxious throughout (Tr. 564). Plaintiff's immediate and recent memory were fair, and her remote memory was good, but her anxiety disrupted her concentration (Tr. 564-65). Dr. Cohen noted that Plaintiff's cognitive functioning was fair to good, except that when Dr. Cohen asked Plaintiff to perform serial sevens, Plaintiff became very stressed and tearful, so Plaintiff did not complete the series (Tr. 565). Plaintiff reported limited daily activities and indicated that she got depressed trying to do adult coloring books, since they reminded her of her mother; she prepared dinner in the microwave; she fed the cats; her friends and family called to check on her, as she lived alone in her deceased parents' house; she called her neighbor to get medications; her sister paid for medications and everything else; she received food stamps; and she had her groceries delivered, which caused her panic when the delivery person did not wear a mask (Tr. 563, 565). Dr. Cohen diagnosed Plaintiff with PTSD, panic disorder, generalized anxiety disorder, dependent personality disorder, and major depressive disorder, moderate recurrent (Tr. 565-66). Though Dr. Cohen concluded that Plaintiff remained competent to handle her own funds, Dr. Cohen found Plaintiff's prognosis poor to fair and indicated that Plaintiff was unable to maintain employment at that time due to emotional instability (Tr. 565).

After conducting the psychological evaluation, Dr. Cohen completed a Psychiatrist/Psychological Impairment Questionnaire (Tr. 568-74). Dr. Cohen

identified the following psychosocial factors as affecting Plaintiff: unemployment, financial, loss of parents, other family up north (sibling in Massachusetts), and living alone (Tr. 568). Like Dr. Almonte, Dr. Cohen indicated that Plaintiff's course of treatment was consistent with Plaintiff's symptoms and limitations, Plaintiff's diagnoses and limitations were expected to last at least 12 months, and Plaintiff was not a malingerer (Tr. 568-69). In support of her diagnoses and assessment, Dr. Cohen identified a host of signs and symptoms that Plaintiff experienced, noting that Plaintiff's severe anxiety, panic attacks, depression, insomnia, and flashbacks were the most frequent (Tr. 569-70). According to Dr. Cohen, Plaintiff would experience episodes of decompensation or deterioration in a work or work-like setting that would cause Plaintiff to withdraw from the situation and/or experience an exacerbation of symptoms because Plaintiff had difficulty leaving the house due to frequent panic attacks and that Plaintiff would have good days and bad days (Tr. 570). As to Plaintiff's functionality in understanding and memory, concentration and persistence, social interactions, and adaptation, Dr. Cohen determined that Plaintiff's degree of limitation ranged from none-to-mild up to marked in various categories of activities (Tr. 571). Dr. Cohen believed that Plaintiff would likely be absent from work more than three times per month because of her impairments and treatment (Tr. 572). Finally, Dr. Cohen opined that Plaintiff's symptoms and limitations began as far back as January 2014 and that Plaintiff's symptoms and functional limitations were reasonably consistent with the clinical and objective findings (Tr. 572).

C.    *State Agency Psychologists*

Two state agency psychologists – Jessy Sadovnik, Psy.D., and Janice Miller, Ph.D. – reviewed Plaintiff's record and offered opinions as to Plaintiff's impairments and limitations (Tr. 25, 70-75, 91-95).   In June 2020, Dr. Sadovnik found that Plaintiff's mental impairments caused limitations in Plaintiff's ability to engage in social interaction and to adapt and that Plaintiff's statements regarding her symptoms were partially consistent with the medical and non-medical evidence in the file (Tr. 72).   Notwithstanding, Dr. Sadovnik determined that Plaintiff experienced no more than moderate limitations in any area of functioning due to her mental impairments (Tr. 73-75).   Dr. Sadovnik opined that Plaintiff retained the ability to perform simple and repetitive tasks and to meet the basic mental demands of work on a sustained basis despite any limitations resulting from her mental impairments (Tr. 75).   Later, in September 2020, Dr. Miller echoed the findings from Dr. Sadovnik (Tr. 91-95)

D.    *ALJ's Decision*

The ALJ addressed each of the medical opinions in the administrative decision (Tr. 24-25).  First, the ALJ deemed Dr. Almonte's opinion non-persuasive (Tr. 24-25). The ALJ found that the objective mental status findings failed to show more than a depressed mood and affect along with mild diffuse memory loss but that more recent findings showed intact memory (Tr. 25). The ALJ also noted that Plaintiff consistently denied suicidal ideation and did not require inpatient hospitalization or a change in her medications (Tr. 25).

As to Dr. Cohen, the ALJ found the opinion partially persuasive to the extent that it was consistent with no more than mild to moderate limitations (Tr. 25). According to the ALJ, the medical evidence failed to establish a marked degree of limitation or that Plaintiff would likely miss more than three days of work per month. Rather, Dr. Cohen's assessment for marked limitations and missing work appeared to be based on Plaintiff's subjective complaints and was not supported by the fairly benign mental status findings during her evaluation and as documented in the progress records of Dr. Almonte (Tr. 25). Lastly, the ALJ stated that the final responsibility for determining whether Plaintiff was disabled or unable to work is a decision reserved for the Commissioner.

With respect to the opinions of the state agency psychological consultants, the ALJ deemed those opinions persuasive (Tr. 25). Specifically, the ALJ found their findings that Plaintiff's mental impairments caused no more than moderate mental limitations and that Plaintiff maintained the ability to perform simple and repetitive tasks meeting the basic mental demands of work on a sustained basis persuasive (Tr. 25). The ALJ concluded that the opinions were supported by the fairly benign mental status findings and Plaintiff's good response to psychotropic medications without change in medications and without adverse side effects (Tr. 25).

The ALJ's consideration of the medical opinions and, in turn, Plaintiff's subjective complaints regarding her symptoms and limitations is not supported by substantial evidence. For example, the ALJ points to Plaintiff's treatment with medication and the lack of a change in Plaintiff's medication regimen as a reason to

discount Dr. Almonte's opinion and Plaintiff's subjective complaints in general.  As an initial matter, even when Plaintiff reported medication compliance, she still consistently and repeatedly presented as tearful, anxious, and depressed and reported continued severe symptoms.  Further, Dr. Almonte's records reflect that the dosages of Plaintiff's medications were in fact changed on more than one occasion, and, importantly, Dr. Almonte recommended adding a fourth medication, Abilify, to Plaintiff's regimen given her continued symptoms.  Since Plaintiff informed Dr. Almonte both that she could not afford a fourth medication and that she felt concerns regarding adding a fourth medication, given a prior reaction to medication requiring hospitalization, Dr. Cohen never added Abilify to Plaintiff's medication regimen.  The ALJ's reliance upon Plaintiff's lack of adjustment to her medications is misplaced.

Moreover, the ALJ's reliance upon "fairly benign" findings and Plaintiff's purported ability to "reside independently and perform a wide range of normal and ordinary activities of daily living" likewise proves problematic (*see* Tr. 21-25).  "[W]hen evaluating a claimant's medical records, an ALJ must take into account the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of a workplace." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1107 (11th Cir. 2021).  Here, Plaintiff consistently and repeatedly presented with psychological symptoms, *even in a controlled environment*.  Plaintiff also indicated that she barely left the house, only going outside twice per month; relied upon family, neighbors, and grocery delivery services to assist her with her everyday tasks; did not shower every day or brush her hair; had family and friends check on her

daily; required frequent reminders from her sister to pay her bills; made only frozen meals; and performed limited household chores, including washing dishes, doing laundry, and washing the floors (Tr. 42-50, 305-12). Even so, as the Eleventh Circuit cautioned in *Schink*, everyday tasks are hardly indicative of a claimant's ability to function in a work environment. 935 F.3d 1245, 1266 (11th Cir. 2019). Certainly, Plaintiff's ability to engage in some minor cleaning, to cook frozen meals, and to otherwise function at home does not indicate how she would function in a more demanding work setting. *See id.*

Lastly, the ALJ found persuasive the opinions of the state agency psychological consultants – who neither examined Plaintiff nor had the benefit of Dr. Cohen's evaluation or the remainder of Dr. Almonte's records reiterating Plaintiff's continued symptoms and limitations stemming from her mental impairments – while finding Dr. Almonte's opinion non-persuasive and Dr. Cohen's opinion only partially persuasive. Though state agency psychological consultants are considered highly qualified and experts in Social Security disability evaluation, 20 C.F.R. § 416.913a(b)(1), the ALJ's decision to find the opinions of these state agency psychological consultants more persuasive than the treating psychiatrist and examining psychologist in this case does not find support in the record. Both Dr. Almonte and Dr. Cohen documented extensive signs and symptoms and, after examining Plaintiff, each indicated that Plaintiff's symptoms and functional limitations were consistent with the evidence of record and, importantly, that Plaintiff was not malingering. They each opined that Plaintiff experienced several marked limitations stemming from her mental

impairments.  And, significantly, they examined and treated Plaintiff after the state agency psychological consultants offered each of their opinions on Plaintiff's functionality.  Accordingly, remand is warranted.

*IV.*     *Conclusion*

For the foregoing reasons, the ALJ failed to apply the correct legal standards, and the ALJ's decision is not supported by substantial evidence.  Accordingly, it is hereby

ORDERED:

1.     The decision of the Commissioner is REVERSED and the matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings consistent with this Order.

2.     The Clerk is directed to enter final judgment in favor of Plaintiff and close the case.

DONE AND ORDERED in Tampa, Florida, on this 27th day of July, 2023.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of Record